FILED
2017 Jul-11 AM 10:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION
CIVIL DIVISION

| | |
|---|---|
| MARIA MILES, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| V. | ) |
| | ) |
| CITY OF BIRMINGHAM, | )   **JURY TRIAL DEMANDED** |
| and CHARLIE WILLIAMS, | ) |
| | ) |
| DEFENDANTS. | ) |

### COMPLAINT

**COMES NOW** the Plaintiff, Maria Miles, by and through undersigned counsel, hereby brings this action against the City of Birmingham (hereinafter Defendant City) and Charlie Williams (hereinafter Defendant Williams). In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge and information and belief:

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. This is a suit authorized and instituted pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," 42 U.S.C. Section 2000e

1

et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. Section 1981a, which provides relief against sexual discrimination and sexual harassment.

2. Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII. Plaintiff filed her charge with the Equal Employment Opportunity Commission (the "EEOC") and that agency has now issued a notice of right to sue following its investigation of Plaintiff's claims. Plaintiff has now filed her Complaint within 90 days of her receipt of the said Notice, and has therefore exhausted all administrative remedies.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § § 1331, 28 U.S.C. § § 1343, 28 U.S.C. § § 1367, and 42 U.S.C. § 2000e et. seq..

4. This action is brought within the judicial district wherein the unlawful employment practices were committed, making venue proper under 28 U.S.C. § 1391(b).

## PARTIES

5. Plaintiff, Maria Miles, is an adult female of more than nineteen (19) years of age. She is a resident of the State of Alabama and this judicial district. She was an employee of Defendant City at all times relevant to this action.

6. Defendant, Charlie Williams, is an adult male of more than nineteen (19) years of age. He is a resident of the State of Alabama and this judicial district.

7. Defendant, City, is a municipal corporation existing under Alabama law and within this judicial district. Defendant City is an employer of Plaintiff and Defendant Williams within the meaning of Title VII at all times relevant to this action.

## STATEMENT OF FACTS

8. Plaintiff began working for Defendant City on or about December, 2013 as a temporary truck driver.

9. Plaintiff met Defendant Williams on or about February, 2014, when he called her into his office regarding an incident about another employee on Plaintiff's truck, where he threatened her with disciplinary action and informed her that he was the deputy director of her department. The following day Defendant Williams called Plaintiff on her radio and asked if

they were having a private conversation, whereupon Plaintiff stated, "No." Defendant Williams then gave Plaintiff his cell number and asked her to call it. When Plaintiff called the number, she was questioned regarding the same employee who was the subject of the meeting the day before, and told to bring that employee to a hearing the next day with Defendant Williams and Director Stephen Fancher. Plaintiff took that employee to the hearing with Fancher and Defendant Williams, whereupon that employee was fired.

10. Within a few days, Defendant Williams began calling Plaintiff's cell phone asking her to work overtime on special events. Around March 7, 2014, Plaintiff received a letter with her paycheck that her temporary assignment would end. On or about March 13, 2014, Defendant Williams called Plaintiff regarding overtime to cut grass on the west end and let her know that everything was going to work out because he had a plan. Defendant Williams told Plaintiff to start cutting in council member Sheila Tyson's district while she was out of town in order to surprise her to gain her vote to keep the funding for the temporary employees. Ms. Tyson did so vote, and the funding was procured, and Plaintiff was permitted to keep her job. About one to two weeks later, Defendant Williams called Plaintiff on her cell phone to ask where she was, and then came to her job site to tell her he

wanted to have a celebration party for her and the other temporary employees at Applebee's. Plaintiff called Defendant Williams and left a message thanking him for the dinner. The following morning Defendant Williams called Plaintiff back and the conversation turned very personal. Plaintiff was under the impression that Defendant Williams was her superior in the chain of command, and had the ability to hire, fire and promote, as previously demonstrated in front of her, so she felt pressured to play along in order to keep her job. He then began to call on a daily basis, and on or about April 16, 2015, he asked her where she lived specifically and came to her house, but she told him he could not come in. Defendant Williams then told Plaintiff to take a ride with him. She complied because she was in fear of occupational repercussions. Defendant Williams took her to what he referred to as "his office" at the Coke building Department of Code Enforcement, where they began having a sexual relationship.

11. Al Hickman and Denita Booker went to Fancher to report the sexual relationship between Plaintiff and Defendant Williams while Plaintiff was still a temporary employee. Fancher asked them how they knew about it, and went back to the employees who has told them to ask about the information, including Michael Cook, Lane Neura, and William Miles.

Fancher asked those employees where they got the information. Fancher called Plaintiff with HIckman and Booker in his office and put her on speaker phone with them listening. He said, "I have Al Hickman and Denita Booker in my office and I have you on speaker. How are things going on east end? Nobody is messing with you over there are they?" Plaintiff replied, "No sir." Fancher then said, "There is nothing going on with you and Charlie Williams." Plaintiff said, "Sir?" Fancher repeated more strongly insisting, "There is nothing going on with you and Charlie Williams?" Plaintiff had to respond to with two other employees listening, "No sir."

12. Fancher later called Plaintiff into his office after Lorenzo Seifers sued Defendant Williams and told her how good of a job she was doing and told her not to talk to Defendant Williams anymore, indicating his knowledge of the affair.

13. Defendant Williams began to show up on Plaintiff's job site almost every day. On or about October 3, 2014, Plaintiff received a letter stating that she was being made permanent, and she called Defendant Williams to tell him. Defendant Williams replied, "Congratulations! I told you I was working on it." He went on to say that every promotion that he procured for a person, that person would buy him a bottle of liquor. Plaintiff then purchased

Defendant Williams the bottle that he specifically asked for in return for the promotion.

14. On December 24, 2014, Defendant Williams spent the night at Plaintiff's house to wake up there Christmas morning together, but left before her daughter woke up. On January 2, 2014, Plaintiff baked a caramel cake for Defendant Williams' daughters at Defendant Williams' request, and Defendant Williams brought his 3 daughters to her house to meet her. Plaintiff was promoted again in January 2015 to crew leader, and Defendant Williams took credit for it and asked Plaintiff for a bottle of 1800 Silver in return. Defendant Williams borrowed a bus from the police department to start a community service program for people to pay off their municipal court fees. He then put up a flyer in each district asking city drivers with passenger endorsements to sign up for driving that bus. However, before the flyers were put up, Defendant Williams told Plaintiff that she already had the position. Therefore, as soon as Plaintiff was promoted to crew leader, she was put on community service bus duty and would not have any further manual labor assignments. She would also no longer have a normal supervisory chain of command. Marty Martin at the southside location was now her immediate supervisor, but he only supervised payroll and ordered

supplies. Defendant Williams would now assign her all duties, give all instructions and review all tasks, because he was the person who developed the community service bus program. Defendant Williams instructed her to park the bus at the east lot instead of southside, because the east lot is the closest lot to her home in order to save her money on gas to commute. Fancher had complete knowledge of all of this.

15. Yolanda McKinney was a city employee on the community service bus with Plaintiff, so she had knowledge of the frequent phone contacts between Defendant Williams and Plaintiff and saw Defendant Williams show up daily on the job to see Plaintiff. Yolanda McKinney was also having a sexual relationship with supervisor Michael Cook. Cook asked Defendant Williams to help promote McKinney. Defendant Williams secured a promotion for McKinney to drive the bus. On or about the last week of April, 2015, Plaintiff and Defendant Williams argued about Defendant Williams placing McKinney on assignment to drive the bus. Defendant Williams then texted Plaintiff, "Me Boss." Plaintiff texted back, "Yes you are." On May 7, 2015, McKinney was driving the bus with Plaintiff as a passenger when it was struck by an 18 wheeler and flipped twice. Plaintiff suffered injuries for which she has treated for the last two years. McKinney

was not cleared to start driving until May 16, 2015. Due to this, Defendant Williams was removed from his deputy director position over the grass and spray divisions, and remained deputy director of only code enforcement, thereby losing two of his three departments.

16. After Plaintiff was released to return to work on or about June 27, 2015, Plaintiff called Defendant Williams to ask where she should report to work. Defendant Williams then sent Teddy Kapera a text telling him that he would receive a new employee Maria Miles on that Monday, even though Defendant Williams was no longer over that department because he had been replaced by Alfred Minnifield. When Plaintiff returned to work, Kapera began giving Plaintiff her assignments and Defendant Williams stopped showing up onsite to visit Plaintiff. However, he continued to call her almost daily and the sexual relationship outside of work continued because of Defendant Williams' power and influence to hire, fire and promote within the City. He also continued to influence her assignments, and would often tell Kapera that he wanted Plaintiff to work on a different assignment than the one Kapera had chosen for her for the day.

17. On or about August 3, 2015, Plaintiff was promoted to Horticulture Maintenance Supervisor. Defendant Williams took credit for the promotion.

9

He made sure that Plaintiff already had her credentials lined up before the job posted. For example, telling her, "Make sure you get your pesticide license this week." He also met her at Smith Middle School to give her what he believed would be the interview questions for the maintenance supervisor position that he had received from Minnifield in order to help her prepare. After assisting Plaintiff with preparations for the promotions, Defendant Williams would mention her to Fancher at the appropriate time for each promotion.

18. Not only did Defendant Williams have the power to hire and promote or at least have heavy influence on those matters such that Plaintiff, McKinney and others believed that he had the authority to hire and promote, but Defendant Williams also had the power to fire. As mentioned in paragraph 10, Plaintiff had seen for herself that power. Furthermore, it is understood among City employees that any deputy director had the power to fire any employee, even in another department. Therefore, even though Kapera was now Plaintiff's supervisor, Plaintiff understood that Defendant Williams continued to have the power to fire her and Kapera did not, so if they gave conflicting orders, Plaintiff would have to follow Defendant Williams' or be

in fear of losing her job. Defendant Williams would often take advantage of this fear.

19. McKinney was also under the impression that Defendant Williams had the authority to hire, fire, and promote employees. Not only had she been the beneficiary of one of Defendant Williams' promotion influences, but she had also witnessed this power on other employees in multiple ways.

20. Employees such as Latonya Warren, Eva Portis and Frank Atkins sometimes accused Plaintiff of having an inappropriate relationship with Defendant Williams, and when Plaintiff would tell Defendant Williams, he would retaliate against those employees by writing them employees up or suspending them. Any employee who asked Plaintiff out or who Defendant Williams suspected of flirting with Plaintiff was also retaliated against by Defendant Williams. Jamal Rodriguez asked Plaintiff out, to which she declined, and when Defendant Williams questioned him about it he told Rodriguez that he would be written up or lose his job. Rodriguez was reassigned by Defendant Williams to a different job. David Jackson also asked Plaintiff out, to which she declined, and Defendant Williams told Jaskson's supervisor Arthurine Brewster and deputy director Herman Wilhite. Wilhite and Brewster then called Jackson into their office and

disciplined him, and Jackson never spoke another word to Plaintiff, including refusing to sell her a cup of coffee thereafter from his cart. Cedric Perry told Plaintiff that employees were forbidden from talking to Plaintiff because, "Word is that you are Mr. Williams' woman, and if I get caught talking to you I'll get fired."

21. In December, 2015, Fancher called Plaintiff, Defendant Williams and supervisor Martin into his office and told Plaintiff and Williams again not to speak with each other. However, even though Fancher continued to display knowledge of the affair, he never disciplined Defendant Williams or in any other way took steps to correct the harassment. About one hour after that meeting, Defendant Williams called Plaintiff from his mother's house phone and told her, "Fancher got real hot when people say that I got you those promotions. I made you. I got you those promotions. Don't worry about what Fancher said. We are going to continue to talk." Then he said they would get "track phones" so that their conversations would not be able to be tracked. For about a month, Plaintiff and Defendant Williams communicated via "track phone," but due to expense, Defendant Williams came up with a new plan to hide their conversations. He told Plaintiff that he would text her with random letters to let her know it was him, and she

needed to call him back immediately when she saw that. She was then to dial *67 before she called him back, which would supposedly hide the call from tracking. If Plaintiff would not call back immediately, Defendant Williams would call her and ask what was taking her so long to call back and inquire about her whereabouts and other questions to keep her within his control.

22. Plaintiff had spoken with a coworker Fatuma Robinson who had been terminated due to the nepotism policy about asking the human resources director Andrea Stallworth why supervisor Marilyn Lewis' daughters had been allowed to stay at the grass department against the nepotism policy when Robinson had been fired for the same. Robinson also took her concern to a city council meeting, where the issue was made public. Defendant Williams was also assisting Robinson, and told Miles to tell her to go to the Equal Employment Opportunity Commission about her claims. Fancher received information that Miles was helping Robinson, and asked her into his office on or about March 18, 2016 to question her about it and also about her work related injury.

23. After Plaintiff's meeting with Fancher, Defendant Williams called Plaintiff and told her, "I just left Steven's Fancher's office and I saw Tracy Evans at

the computer doing the paperwork, and normally I don't defy my boss but I had to let you know that I hate to ask you to do this but you need to resign by the close of business today even if you have to write it on a paper bag - effective immediately and take your keys and radio to the office and give it to them at the desk and don't say anything to anybody." He also told her not to answer the phone even if Fancher called. Plaintiff did as she was told, and later Defendant Williams called her to explain that she was going to be served papers to attend a hearing and that Donna Kent would have fired her because he had gotten statements from several city employees that Plaintiff had told them to go file against Fancher at EEOC. This all later proved to be false, and Defendant Williams constructively terminated Plaintiff in order to cover up his involvement and his affair.

24. Defendant Williams made multiple promises to Plaintiff about getting her job back and instructed her on how to lie on her application to the city order to do so, but Plaintiff refused to lie on a job application. During one recorded phone call on April 6, 2016, Defendant Williams detailed a plan on how he would assist her in getting her job back and explaining why he had her resign in the first place.

25. On or about two months prior to the constructive termination, Defendant City installed a GPS tracking system on Defendant Williams' truck, so he stopped coming to Plaintiff's house in his city truck, and instead began parking it at the Coke building and taking his personal vehicle to see her. However, on or around April 22, 2016, Defendant Williams drove his city truck to Plaintiff's house around midnight and left the next morning around six. This was the last time Plaintiff and Defendant Williams engaged in sexual intercourse. After that Miles no longer believed that Defendant Williams would get her job back, so she terminated the affair.

## CAUSES OF ACTION

### COUNT I

### TITLE VII - SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

26. Plaintiff adopts and re-alleges all paragraphs set forth above as if fully set forth herein.

27. Defendant City subjected Plaintiff to a sexually hostile and discriminatory work environment in violation of 42 U.S.C. § 2000e et. seq. that was sufficiently severe or pervasive to alter the terms and conditions of her employment.

28. The actions of Defendant City, through its agents, were taken with malice or reckless indifference to the federally-protected rights of Plaintiff.

29. Defendant City ratified and/or condoned such hostile and abusive behavior by failing to guard against such misconduct of its employees and supervisors, failed to monitor them and failed to take appropriate action.

30. A reasonable person would find that the work environment endured by Plaintiff was objectively and subjectively hostile and discriminatory, and the harassment negatively impacted Plaintiff's employment.

31. Plaintiff suffered and was constructively discharged because tangible employment actions from a supervisor or person acting with the authority of the Defendant City created an environment that forced her to resign.

WHEREFORE, Plaintiff requests this Honorable Court to award declaratory and injunctive relief, pre-judgment interest, attorneys' fees, costs, compensatory damages, punitive damages, and such other legal or equitable relief to which Plaintiff may be entitled.

## COUNT II

## INVASION OF PRIVACY

32. Plaintiff adopts and re-alleges all paragraphs set forth above as if fully set forth herein. This is a claim against Defendant Williams arising under the laws of the State of Alabama prohibiting his conduct in invading Plaintiff's privacy.

33. The extreme conduct of Defendant Williams, as aforesaid, was an intentional invasion of Plaintiff's private activities and Defendant City was aware of said conduct.

34. Defendant City failed to take adequate steps to remedy the situation.

35. The intentional invasion of privacy altered Plaintiff's work environment and proximately caused her to suffer severe emotional distress, mental anguish, embarrassment, humiliation and trauma for which she claims damages.

WHEREFORE, Plaintiff requests this Honorable Court to award declaratory and injunctive relief, compensatory and punitive damages, mental anguish, costs, attorney's fees, and all such other relief the trier of fact may assess.

## COUNT III

## NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION

36. Plaintiff adopts and re-alleges all paragraphs set forth above as if fully set forth herein. This is a claim arising under the laws of the State of Alabama to redress the negligent hiring, training, supervision and retention of Defendant City's employees, specifically, Defendant Williams.

37. Defendant City had a duty to provide a reasonably safe, non-hostile, and non-discriminatory work environment to Plaintiff and other female employees. It was foreseeable that Defendant Williams could take advantage of his supervisory position in such an environment.

38. Defendant City failed to implement any changes into Defendant William's supervision and failed to appropriately train him.

39. As a proximate result, Plaintiff suffered different terms and conditions of her employment, severe emotional distress, humiliation, mental anguish, trauma and embarrassment, and financial loss.

WHEREFORE, Plaintiff requests this Honorable Court to award declaratory and injunctive relief, award of lost employment benefits and wages, back pay, front pay, interest, compensatory and punitive damages, mental anguish, costs, attorney's fees, and all such other relief the trier of fact may assess.

## COUNT IV

## RETALIATION

40. Plaintiff adopts and re-alleges all paragraphs set forth above as if fully set forth herein.

41. Plaintiff was constructively terminated and not rehired into her previous position or any position in retaliation for engaging in a protected activity under Title VII.

42. Such unlawful employment practices proximately caused Plaintiff to suffer severe emotional distress, mental, anguish, shame, embarrassment, humiliation, trauma and financial loss for which she claims damages.

WHEREFORE, Plaintiff requests this Honorable Court to award declaratory and injunctive relief, pre-judgment interest, attorneys' fees, costs, compensatory damages, punitive damages, and such other legal or equitable relief to which Plaintiff may be entitled.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.**

*Maria Miles*
Maria Miles, Plaintiff

STATE OF ALABAMA )
                 )
COUNTY OF JEFFERSON )

I, the undersigned, a Notary Public in and for said County and State, hereby certify that Maria Miles, whose name is signed to the foregoing instrument, did swear to and ascribe as true the contents of the Complaint before me on this day that, being informed of the contents of the instrument, she executed the same voluntarily on the day that same bears date.

Given under my hand this 6th day of July, 2017.

NOTARY PUBLIC
Commission Expires: March 4, 2018

Respectfully submitted,

Lauren H. Shine
Alabama Bar No: ASB-3115-A32H
Attorney for Plaintiff

**OF COUNSEL:**
**SHINE LAW FIRM, LLC**
PO Box 660011
Birmingham, AL 35266
laurenhshine@gmail.com
(205) 703-0587