**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARIA MILES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:17-CV-1156-RDP** |
| | } | |
| **CITY OF BIRMINGHAM, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This sexual harassment and retaliation action involves an admitted two-year, sexual relationship between Plaintiff, Maria Miles, and her superior, Charlie Williams, during their employment with the City of Birmingham ("the City") and Plaintiff's subsequent resignation in March 2016. The City and Williams have each filed Motions for Summary Judgment. (Docs. # 16, 17).[1]

The court recognizes that unwanted sexual attention in the workplace is a concern that rightly occupies the minds of both employers and employees. In addressing workplace discrimination disputes, judges (including the undersigned) must be keenly aware that sexual harassment is an acute problem that affects our society. Having said that, the court is duty-bound to examine the facts of each case under the legal framework which the Supreme Court and the Eleventh Circuit have established. With these concerns in mind, the court has carefully considered

---

[1] The Motions have been fully briefed (Docs. # 22-23, 33-34) and are ripe for decision. The court makes one initial note about the parties' briefing responsibilities. The Initial Order (Doc. # 6), entered on August 10, 2017, requires all summary judgment briefing to comply with Appendix II to the Order. Plaintiff's opposition briefs to Defendants' motions for summary judgment (Docs. # 22, 23) fail to comply with Appendix II in that the Narrative Statements of Facts do not indicate which facts are disputed or undisputed. Nevertheless, the court has carefully studied the Rule 56 record to parse out the disputed and undisputed facts. However, this is the job of counsel, not the court. Plaintiff's counsel is cautioned that any further summary judgment briefing in this court, not just in this case, shall follow the requirements of Appendix II or counsel will be ordered to re-brief the subject filing.

Plaintiff's claims and the summary judgment record. However, no evidence in the Rule 56 record suggests that Plaintiff's two-year relationship with Williams was unwelcome. Accordingly, for the reasons more thoroughly explained below, Defendants' Motions for Summary Judgment (Docs. # 16, 17) are due to be granted.

## I. Factual Background[2]

First, the court discusses the Rule 56 evidence regarding Plaintiff's relationship with Williams and its effect on her employment. Second, the court outlines the summary judgment evidence regarding the actions the City took to prevent sexual harassment in the workplace. Finally, the court addresses the circumstances surrounding Plaintiff's resignation and her filing of a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

### A. Plaintiff's Employment with the City and Her Relationship with Defendant Williams

Plaintiff worked in the City's Department of Public Works from November 27, 2013 until March 16, 2016. (Docs. # 22-1 at 23). Although she started as a temporary truck driver, Plaintiff was promoted several times and eventually attained the position of Maintenance Supervisor. (*Id.* at 165). From February 2014 to December 1, 2017, Williams was the Deputy Director of the Department of Public Works and had supervisory authority over Plaintiff at various points in her employment. (Docs. # 22-2 at 7, 25; 16-2).

Plaintiff first met Williams around February 2014 when he investigated two of Plaintiff's coworkers for employee misconduct. (Docs. # 22-2 at 34). Plaintiff explained the incident to Williams, and Williams ultimately recommended that the two employees be terminated. (*Id.*).

---

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

After this initial contact, Plaintiff continued to act as a "confidential informant" for Williams when employees committed violations of City policies. (*Id*.).

Over the course of the next few weeks, Plaintiff and Williams flirted via text message. (*Id*. at 35). In early 2014, Plaintiff accepted Williams's invitation to have dinner with him outside of work. (Doc. # 22-1 at 42-43). Prior to their date, Williams had never used vulgar language or made inappropriate advances toward her. (*Id*. at 42). Shortly after their dinner, Plaintiff and Williams had their first sexual encounter. (*Id*. at 44-47). Plaintiff did not push Williams away or reject his advances. (*Id*. at 46).

Thereafter, Plaintiff and Williams participated in a two-year relationship, which ended in approximately April 2016. (*Id*. at 49). They talked on the phone and texted each other every day. (*Id*. at 51-52). In fact, Plaintiff initiated many of these communications herself, including asking Williams when he would come to her apartment. (*Id*. at 54, 66). On several occasions, Plaintiff allowed Williams to stay overnight without engaging in any sexual activity. (*Id*. at 55-57). Williams frequently visited on the weekends and developed a relationship with Plaintiff's youngest daughter. (*Id*. at 60-61). "[H]e would talk to her, let her play with his phone,…[and] give her money." (*Id*. at 61). Plaintiff also introduced Williams to her son and her sister. (*Id*. at 68).

To celebrate her one-year anniversary with Williams, Plaintiff suggested and planned a trip to Anniston. (*Id*. at 63-65). Plaintiff drove and paid cash for their hotel stay, while Williams paid for their meals. (*Id*. at 64; Doc. # 22-2 at 35). Shortly after their trip, Plaintiff told Williams she loved him and gave him a key to her apartment. (*Id*. at 65, 72). He did not ask for the key, but Plaintiff thought "it would be easier" for him to "come on in and not have to worry about [her] falling asleep or anything like that." (*Id*. at 72). She also told one of her coworkers that she was in

love with Williams. (*Id*. at 65-66). Periodically, Williams called her "Mush Cake," and Plaintiff would respond with "Mush Cake miss you." (*Id*. at 67).

During work hours, Williams would greet Plaintiff by saying "hey, cutie" or "hey, sexy." (*Id*. at 83). On at least one occasion, he told a friend over the phone that "he was watching this sexy, young thang cut grass," referring to Plaintiff. (*Id*.). Plaintiff was not offended by this conduct. (*Id*.). Instead, she smiled. (*Id*.). According to Plaintiff, Williams also "rubbed [her] butt" at work "once or twice." (*Id*. at 84). Again, Plaintiff was not offended and only told him to stop because "somebody could have [seen] him." (*Id*. at 84-85).

Plaintiff testified that even when he was not acting as her direct supervisor, Williams sometimes contacted her supervisors to change her daily work assignments. (*Id*. at 141-42, 158-61). He hovered near Plaintiff at job locations, drawing the attention of her coworkers. (*Id*. at 140-41). If Williams did not know where Plaintiff was assigned on a particular day, "he would call the radio" or "call [Plaintiff's] phone. If [she] didn't answer, he would continue to call." (*Id*. at 141). Plaintiff felt that Williams took credit for her career advancement. (*Id*. at 146-47). Specifically, he advised her about what certifications she needed to be considered for a position (*Id*. at 164-65) and recommended her for promotions to her supervisors (*Id*. at 164).[3]

At no point in their relationship did Plaintiff communicate to Williams that his advances or their sexual encounters were unwelcome. (*Id*. at 74, 88-89). Plaintiff testified at her deposition that "[Williams] wouldn't have [known the relationship was unwelcome] because I never gave him any indications because of what I thought he might do to me. So I kept it as if everything was okay, but it wasn't." (*Id*. at 88-89).

---

[3] The court notes that Williams denies interfering with Plaintiff's daily work assignments or recommending her for promotions. (Doc. # 22-2 at 96, 144-47). But, for purposes of Rule 56, this is a disputed matter and the court accepts Plaintiff's version as true.

Williams never directly threatened Plaintiff by telling her there would be consequences affecting her career if she ended the sexual relationship. (*Id*. at 90). But, Plaintiff testified that she felt *indirectly* threated because Williams implied that he had control over her job by saying "how you got to where you got. Its because of me. I'm the one that helped you [get] there…And everything I say do, that's what you do, and don't pay them any attention." (*Id*. at 90-91). According to Plaintiff, "[h]is favorite saying was let nobody take your power." (*Id*. at 138).

**B.      The City's Sexual Harassment Policies and Response to the Relationship**

During orientation, the City gives all new employees a copy of the City's Sexual and Gender Harassment Policy and explains how to report harassment. (Doc. # 16-6 at 28-29). The Sexual and Gender Harassment Policy provides in pertinent parts:

> It is the policy of the City of Birmingham that sexual or gender harassment of City employees or applicants for City employment is strictly prohibited and shall be grounds for dismissal.
>
> …
>
> Sexual harassment for purposes of this policy is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:
>
> > (a)  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or
> > (b)  Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
> > (c)  Such conduct has the purpose or effect of interfering with an individual's work.
>
> Individuals who feel that they have been sexually harassed are encouraged to take action themselves in a rational and responsible way.
>
> …
>
> Other Actions:
>
> > (a)  Report incidents of sexual harassment to your supervisor, your supervisor's superior, or the City's Human Resources Department.

…

Supervisors can be held personally liable if they:

(a) Make sexual advances.
(b) Use sex as an expression of power or dominance.
(c) Suggest that sexual favors are a condition of employment.
(d) Discriminate as to gender.
(e) Otherwise create a hostile work environment or condone sexual or gender harassment in the workplace.

(Doc. # 16-8 at 1-4).

On December 12, 2013, Plaintiff received a copy of the Sexual and Gender Harassment Policy at her new employee orientation. (Docs. # 22-1 at 86-87; 16-3). Plaintiff also signed an acknowledgement form that states: "If I feel I am being harassed, I have a right and responsibility to communicate this directly to the alleged harasser, my supervisor, department head, a non-involved supervisor, the City's Personnel Office and/or seek resolution through the grievance and complaint procedures of the Rules and Regulations of the Jefferson County Personnel Board." (Doc. # 16-3).

In January 2015, the City conducted a mandatory training session with all employees, including Department Directors and Deputy Directors. (Doc. # 16-6 at 29-30). City officials instructed attendees on the provisions of the Sexual and Gender Harassment Policy and provided examples of conduct constituting sexual harassment. (*Id*.). Plaintiff attended this session and signed another acknowledgement form certifying that she had neither suffered nor was aware of any conduct at her work station "that would constitute sexual or gender harassment under the [Policy] within six months of the date of this certification." (Doc. # 16-4).

Moreover, Plaintiff personally discussed the Policy with the Director of Public Works, Stephen Fancher. (Docs. # 22-1 25-26; 16-7). In fact, Fancher approached Plaintiff two or three

times following complaints from her coworkers about her relationship with Williams. (Doc. # 22-1 at 17-18, 98, 107-109). Plaintiff testified at her deposition that on one occasion, Fancher called her after hours with two other employees listening on the line to ask whether there was anything happening between her and Williams. (*Id*. at 18, 152-53). In Plaintiff's view, Fancher's tone implied a statement, rather than a question—as if he was instructing her to answer in the negative. (Doc. # 22-1 at 153). Plaintiff answered no. (*Id*.). Twice, Fancher directly asked Plaintiff whether she was having a relationship with Williams. (*Id*. at 18, 153-54). Each time, she denied the relationship. (*Id*. at 18). During one of these conversations, Fancher informed Plaintiff that Williams was a married man with two children. (*Id*. at 50, 154). Fancher also instructed Williams to stay away from Plaintiff. (*Id*. at 17).

Despite her awareness of the City's Sexual and Gender Harassment Policy and the different avenues for reporting sexual harassment, Plaintiff never utilized any of these reporting mechanisms. (*Id*. at 180-81). When asked how the City would have known that she was having an unwelcome relationship with Williams, Plaintiff responded, "They wouldn't have because I didn't say anything to anybody because of the conversations that I had with Mr. Williams and the statements that Mr. Williams had made to me saying he put me where I was and Fancher had nothing to do with it." (*Id*. at 89). Plaintiff testified that she did not tell her supervisors about the relationship because she feared Williams would retaliate against her: "I've seen how he's done other employees when they've done something to him or said anything about anybody, the way that he would target them, have them written up." (*Id*. at 13). Consequently, prior to the filing of Plaintiff's EEOC charge, the City never received notice that Plaintiff was either subjected to an allegedly hostile work environment or forced to participate in an unwelcome relationship. (Doc. # 16-6 at 28).

### C.     Plaintiff's Resignation and EEOC Charge

In late 2015 or early 2016, Plaintiff's coworker, Fatuma Robinson, approached Plaintiff to complain about nepotism in the City's hiring practices. (Docs. # 22-1 at 22-24; 16-2). In her deposition, Plaintiff explained that Robinson was upset about "not being hired with the City and that the other supervisor had got her daughters on. And she knew that the daughters were not being hired, and Ms. Fatuma felt that that caused a problem as far as her being discriminated against." (Doc. # 22-1 at 22-23).  Plaintiff advised Robinson to first take her complaint to Fancher, then to the EEOC. (*Id*. at 23-24, 28-29, 122-23, 155-56).[4]

On March 16, 2016, Fancher called Plaintiff to his office to question her about reports that Plaintiff was telling her coworkers to bring their sexual harassment claims directly to the EEOC. (*Id*. at 25-27, 155-57; Doc. # 16-7). He read from the City's Sexual and Gender Harassment Policy, but he did not directly ask Plaintiff about Robinson's complaint. (*Id*.). Plaintiff responded that she had not talked with other employees about sexual harassment. (*Id*. at 37-38; Doc. # 16-7). She did not tell Fancher about her conversations with Robinson because she wanted to protect Williams. (Doc. # 22-1 at 156-57). Plaintiff left the meeting thinking her professional relationship with Fancher had suffered, but she did not feel as though her job was in jeopardy. (*Id*. at 38). Furthermore, the City did not initiate any discipline against Plaintiff. (*Id*. at 31). Plaintiff turned in her resignation letter on March 18, 2016, citing "personal reasons" as the cause for her decision. (Doc. # 16-5).

---

[4] The Rule 56 record is unclear as to what Robinson specifically complained of. It seems as though she considered the City's refusal to hire her daughters to be an uneven application of the City's (official or unofficial) policy on nepotism. Regardless, the factual details of her complaint are immaterial to this court's analysis. As explained more thoroughly below, nepotism is not an unlawful employment practice under Title VII. Even if it was, the Rule 56 record does not demonstrate that Plaintiff engaged in any statutorily protected activity or suffered any adverse employment action as a result.

There is conflicting Rule 56 evidence about what happened after Plaintiff's meeting with Fancher on March 16, 2016. Plaintiff testified that Williams called her and told her she needed to resign before the City had a chance to fire her. (*Id*. at 34-36). And, she claims that Williams's advice that she should resign was the only reason she actually did so. (Doc. # 22-1 at 35-36). According to Plaintiff, there were no other reasons motivating her resignation and absent that call, she would not have resigned. (*Id*.). By contrast, Williams testified that he had nothing to do with her resignation. (Doc. # 22-2 at 175). He specifically denied discussing Plaintiff's resignation with her before she resigned. (*Id*. at 205-206).

Plaintiff's sexual relationship with Williams continued after her resignation. (*Id*. at 73-74). She testified that they had two sexual encounters after March 18, 2016. (*Id*.). Once it became clear that Williams could not help her get reinstated, Plaintiff ended the relationship in April 2016, about a month after her resignation. (*Id*. at 74-80).[5]

On July 5, 2016, Plaintiff filed a Charge of Discrimination with the EEOC. (Doc. # 22-8). Her charge asserts that Williams subjected her to a hostile work environment between April 2014 and March 2016 when he told her to resign. (*Id*.). About a year later, Plaintiff received her right-to-sue and filed the Complaint initiating this case on July 11, 2017. (Doc. # 1).[6]

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party

---

[5] Williams confirmed that their sexual relationship ended in April 2016, but he testified that they continued to communicate until about June 2016.  (Doc. # 22-2 at 200-204).

[6] The Rule 56 record does reveal the specific date on which Plaintiff received her right-to-sue letter.

asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

After careful review, and for the reasons explained below, the court concludes that Defendants are entitled to summary judgment on all of Plaintiff's federal claims under Title VII. As a result, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).

### A. The City is Due Summary Judgment on Plaintiff's Title VII Sexual Harassment and Hostile Work Environment Claim

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's…sex." 42 U.S.C. § 2000e–2(a)(1). An actionable sex-based violation of Title VII may

be committed in one of two ways: (1) "through tangible employment action" (often referred to as *quid pro quo* harassment) or (2) "through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of the work." *Osburn v. Hagel*, 46 F. Supp. 3d 1235, 1241 (M.D. Ala. 2014) (citing *Nurse "BE" v. Columbia Palms W. Hosp., Ltd. P'ship*, 490 F.3d 1302, 1308 (11th Cir. 2007)). If the Rule 56 record indicates that an employer did not take any tangible employment action against a plaintiff, the employer is entitled to invoke the *Faragher/Ellerth* affirmative defense to a claim asserted under the hostile work environment theory. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). In her response brief, Plaintiff argues that the City's conduct constituted sexual harassment under both theories.[7] (Doc. # 22 at 11-20). The court addresses each theory in turn and concludes that the City is entitled to summary judgment on Plaintiff's sexual harassment claim.

### i. Tangible Employment Action

A tangible employment action involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 429 (2013) (citing *Ellerth*, 524 U.S. at 761). "The test for an adverse employment action in a disparate treatment context is similar to the one for a tangible employment action in a harassment analysis." *Hyde v. K.B. Home, Inc.*, 355 F. App'x 266, 271 (11th Cir. 2009) (equating standards for adverse employment action and tangible employment action); *see also Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008) (same). The City argues that there was no

---

[7] Although Plaintiff focuses the vast majority of her arguments on the hostile work environment theory of sexual harassment, out of an abundance of caution, the court first addresses Plaintiff's claim under a tangible employment action theory.

tangible employment action against Plaintiff because she voluntarily resigned citing "personal reasons." (Docs. # 16 at 23; 16-5). Plaintiff counters that the City, through Williams, took at least two tangible employment actions with respect to her employment: (1) Williams's advice to Plaintiff that she should resign and (2) Williams's active assistance to Plaintiff in securing several promotions. (Doc. # 22 at 16-17). For the reasons explained below, the court agrees with the City and finds that the tangible employment action theory is inapplicable in this case.

First, the Rule 56 evidence does not establish that Williams's advice (or even instruction) to Plaintiff to resign amounted to a tangible employment action. Critically, a "normal voluntary resignation" is not considered a tangible employment action. *See Jones v. USA Petroleum Corp.*, 20 F. Supp. 2d 1379, 1383 (S.D. Ga. 1998); *see also Williams v. Ala. Dep't of Corr.*, 649 Fed. Appx. 925, 928 (11th Cir. 2016) (noting that voluntary resignations do not constitute an adverse employment action). Plaintiff insists that her resignation was neither "normal" nor voluntary because Williams "falsely [claimed] that she was about to be fired." (Doc. # 22 at 16-17). To be sure, Williams disputes Plaintiff's version of the facts and denies even speaking to her before she turned in her resignation letter. (Doc. # 22-2 at 175, 205-206). The court must credit Plaintiff's version of the facts for summary judgment purposes. But, even if Williams instructed Plaintiff to resign, that would still not constitute a tangible employment action because the choice to resign was ultimately left to Plaintiff. *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) ("[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges."). In other words, even crediting Plaintiff's testimony, Williams gave her advice that she should resign, but it was not Williams's advice that "significantly change[d] [her] employment status." *Vance*, 570 U.S. at 429. Rather, it was her decision to heed that advice. On this record, Plaintiff has failed to show that her resignation was

anything but voluntary.

Under circumstances such as this (where a plaintiff has resigned her employment), for such a resignation to qualify as a tangible employment action, a plaintiff must show that a constructive discharge occurred, meaning that her employer made working conditions so intolerable that she was "forced" to resign. *See Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). In her Amended Complaint, Plaintiff briefly alleges that she was "constructively discharged because tangible employment actions from a supervisor or person acting with the authority of the Defendant City created an environment that forced her to resign." (Doc. # 30 at ¶ 31). However, Plaintiff has not presented the court with any additional argument in her briefing to support this allegation. And, more significantly, the Rule 56 record does not indicate that she was effectively "forced" to resign. To be sure, Plaintiff testified that following her conversation with Fancher, she did not think her job was in jeopardy. (Doc. # 22-1 at 38). She also testified that Williams's call telling her to resign was the only reason she resigned. (Doc. # 22-1 at 35-36). According to Plaintiff, there were no other reasons motivating her resignation, including any alleged sexual harassment. (*Id.*). Also fatal to any constructive discharge claim, Plaintiff never formally complained to either Williams or the City to give them an opportunity to remedy her working conditions. (Docs. # 22-1 at 89, 180-81; 16-6 at 28). *See Kilgore*, 93 F.3d at 754 (affirming summary judgment because constructive discharge is not viable if the employer is not given sufficient time to remedy the situation). Consequently, Plaintiff has failed to establish that the City took any tangible employment action against her with respect to her resignation.

Second, the Rule 56 evidence does not suggest that whatever assistance Williams provided Plaintiff in securing several promotions constitutes any type of a tangible employment action. As stated above, "[t]he test for an adverse employment action in a disparate treatment context is

similar to the one for a tangible employment action in a harassment analysis." *Hyde*, 355 F. App'x at 271. The necessary implication, then, is that the employment action must be "adverse." "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). Helping Plaintiff to obtain a promotion cannot be characterized adverse because it had a positive effect on her employment. Indeed, the contemplated tangible employment action under *Ellerth* is the *denial* of a promotion. 524 U.S. at 761.

Finally, nothing in the Rule 56 record indicates that Plaintiff suffered any *quid pro quo* sexual harassment. *Quid pro quo* sexual harassment exists when "submission to sexual conduct is either explicitly or implicitly a term or condition of an individual's employment, or when submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." *Sparks v. Reg'l Med. Ctr. Bd.*, 792 F. Supp. 735, 742 (N.D. Ala. 1992) (internal quotations omitted). Under such circumstances, an employer is strictly liable for the actions of its supervisors because the harassing supervisor typically acts "within at least the apparent scope of the authority entrusted to him by the employer" in effectuating the harassment. *Id*. at 743 (citing *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir. 1982). Although the Rule 56 record shows that Plaintiff and Williams engaged in a two-year sexual relationship, Plaintiff acknowledges that Williams never told her there would be consequences affecting her career if she ended the sexual relationship. (*Id*. at 90). There is also no evidence that Williams conditioned whatever assistance he offered Plaintiff in securing promotions on her participation in the relationship. The evidence clearly establishes that Williams "never demanded sexual favors from [P]laintiff as a quid pro quo for job benefits nor made submission to sexual conduct a term or condition of [her] employment." *Sparks*, 792 F. Supp. at 745. Rather, as explained more

thoroughly below, the record demonstrates that Plaintiff welcomed the relationship. Because submission to or rejection of Williams's advances was never a quid pro quo to job benefits, the City cannot be held liable under a *quid pro quo* sexual harassment theory.

Because Plaintiff has failed to demonstrate that she suffered any tangible employment action that negatively impacted her employment, her only remaining avenue of relief on her sexual harassment claim against the City is the hostile work environment theory, which the court addresses below.

### ii. Hostile Work Environment

A Title VII hostile work environment claim requires proof that "discriminatory intimidation, ridicule, and insult [permeate the workplace in a manner] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. United Launch All., LLC*, 286 F. Supp. 3d 1293, 1302 (N.D. Ala. 2018) (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)). In order to establish a *prima facie* case under the hostile work environment theory, an employee must demonstrate: "(1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). The City focuses on the unwelcomeness prong and argues that summary judgment is appropriate because the Rule 56 evidence shows that Plaintiff and Williams were engaged in a two-year, welcome, sexual relationship. (Doc. # 16 at 19-23).

"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (citing 29 C.F.R. § 1604.11(a) (1985)). The conduct must be "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982). Furthermore, the "voluntariness" of the employee's participation in sexual intercourse is not dispositive. *Meritor*, 477 U.S. at 68. Rather, "[t]he correct inquiry is whether [the employee] by her conduct indicated that the alleged sexual advances were unwelcome." *Id*.

Plaintiff's own testimony confirms that she willingly engaged in a two-year relationship with Williams. (Doc. # 22-1 at 49). The relationship began in early 2014 (after weeks of flirting via text messages), when Plaintiff accepted Williams's invitation for dinner. (*Id*. at 35, 42-43). Shortly thereafter, they had their first sexual encounter. (*Id*. 45-47). Plaintiff testified at her deposition that Williams initiated the encounter by placing his hand on her knee. (*Id*. at 45). She did not push his hand away or tell him to stop. (*Id*.). Williams then began kissing her; again, she did not tell him to stop. (*Id*. at 46).

Throughout their relationship, the Rule 56 evidence shows that Plaintiff welcomed the relationship. Plaintiff and Williams talked on the phone and texted each other every day. (*Id*. at 51-52). Though Plaintiff testified that she would occasionally avoid his calls, she initiated many calls herself. (*Id*. at 53-54, 66). When asked if she ever contacted Williams to initiate any sexual contact, she answered yes and explained that she would call him and ask if he planned on coming over. (*Id*. at 66). Plaintiff invited Williams to spend the night at her apartment on at least three occasions so that they could wake up together. (*Id*. at 55-57, 62). Williams frequently visited Plaintiff's apartment on the weekends and developed a relationship with her five-year-old

daughter. (*Id*. at 60-61). "[H]e would talk to her, let her play with his phone,…[and] give her money." (*Id*. at 61). Williams also met Plaintiff's son and her sister. (*Id*. at 68).

Additionally, Plaintiff suggested and planned a trip to Anniston to celebrate with Williams their one-year anniversary. (*Id*. at 63-65). Plaintiff drove and also paid cash for their hotel. (*Id*. at 64; Doc. # 22-2 at 35). Also telling, Plaintiff told Williams she loved him and gave him a key to her apartment. (*Id*. at 65, 72). He did not ask for the key, but Plaintiff thought "it would be easier" for him to "come on in and not have to worry about [her] falling asleep or anything like that." (*Id*. at 72). She also told one of her coworkers that she was in love with Williams. (*Id*. at 65-66). Williams called her "Mush Cake," and Plaintiff would respond with "Mush Cake miss you." (*Id*. at 67).

Plaintiff also testified that she was not offended by Williams's behavior towards her during working hours. The Rule 56 record indicates that Williams addressed Plaintiff as "cutie" or "sexy" and "rubbed [her] butt" at work once or twice. (*Id*. at 83). Plaintiff stated that she was not offended, but simply smiled in response. (*Id*.). In fact, in January 2015, she signed a Training Acknowledgement Form formally acknowledging that she had not suffered or was aware of any conduct at her work station "that would constitute sexual or gender harassment" under the City's policies. (Doc. # 16-4). Plaintiff further admits that she never complained to the City of any sexual harassment. (Doc. # 22-1 at 89).

At no point during their relationship did Plaintiff communicate to Williams that his advances and sexual encounters were unwelcome. (*Id*. at 74, 88-89). Indeed, Plaintiff testified that she and Williams engaged in two more sexual encounters after she resigned, but she ended the sexual relationship towards the end of April 2016—one month after her resignation. (*Id*. at 73-74).

Plaintiff counters that although her participation in the relationship was voluntary,

Williams's advances "were not welcome because she did not solicit most of the actions and felt pressured in order to keep her job." (Doc. # 22 at 13). Specifically, Plaintiff testified that while Williams never directly threatened that there would be consequences if she refused his advances, she felt *indirectly* threatened because Williams implied that he had control over her job by saying "how you got to where you got. It's because of me. I'm the one that helped you [get] there…And everything I say do, that's what you do, and don't pay them any attention." (Doc. # 22-1 at 90-91). Essentially, Plaintiff argues that her two-year relationship with her superior was not welcome because she had seen the consequences of Williams's influence in the workplace—namely, his ability to write-up and suspend other employees.

However, this argument misunderstands the crux of the welcomeness inquiry, which focuses on (1) whether the employee "regarded the conduct as undesirable or offensive" and (2) whether the employee's conduct "indicated that the sexual advances were unwelcome." *Henson*, 682 F.2d at 903; *Meritor*, 477 U.S. at 68. Plaintiff's own testimony demonstrates that she welcomed a relationship with Williams. In her deposition, Plaintiff repeatedly testified that she was not offended by Williams calling her cute or sexy in the workplace. (Doc. # 22-1 at 83). Likewise, her undisputed conduct over the course of the two-year relationship forecloses her argument that she perceived Williams's advances as unwelcome. Again, Plaintiff told Williams and a co-worker that she was in love with him (*Id*. at 65); she gave Williams a key to her apartment so that he could access her bedroom without waking her up (*Id*. at 72); she planned and paid for an out-of-town anniversary trip (*Id*. at 63-65); she responded affectionately to Williams giving her the pet name, Mush Cake (*Id*. at 67); and she continued the sexual relationship with him even after she resigned her employment (*Id*. at 73-74). Plaintiff never refused any of Williams's sexual advances, and even initiated several sexual encounters herself. (*Id*. at 74, 88-89). Finally, although

she was given at least three opportunities to report any unwelcome sexual harassment, she never complained about Williams and went so far as to deny the relationship each time to protect herself and Williams. (*Id.* at 17-18, 98, 107-109, 152-53). Plaintiff's own conduct belies her argument that she felt pressured to continue a two-year relationship with a man she admittedly loved. Indeed, Plaintiff's *ex post facto* characterization of the facts does not change the undisputed facts in the Rule 56 record. Based on the record before the court, no reasonable jury could find that Plaintiff's conduct indicated that her relationship with Williams was unwelcome. Consequently, Plaintiff has failed to establish a *prima facie* case of a sexually hostile working environment because she has not shown that Williams's conduct was unwelcome.

### iii. *Faragher-Ellerth* Affirmative Defense

Even if a reasonable jury could find that Plaintiff perceived her two-year relationship with Williams as unwelcome (and, to be clear, a reasonable jury could not), the City is still entitled to prevail on its Motion based on its *Faragher-Ellerth* affirmative defense. In the absence of a tangible employment action, "[a]n employer avoids liability under this defense if: (1) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior'; and (2) the employee 'unreasonably failed to take advantage of any preventative or corrective opportunities [it] provided.'" *Nurse "BE"*, 490 F.3d at 1308–1309 (quoting *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765). The City "bears the burden of establishing both of these elements." *Nurse "BE"*, 490 F.3d at 1309.

> **1. The Rule 56 evidence is undisputed and shows that the City took reasonable care to prevent and correct the sexually harassing behavior.**

The first prong of the defense involves two separate showings—that the employer took reasonable care to prevent harassment and then took reasonable care to correct the harassment

once identified. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001). Although the parties have conflated these two elements in their briefing, the court analyzes each part separately and finds that the City satisfies its burden on the first prong of the *Faragher-Ellerth* affirmative defense.

An employer demonstrates that it took reasonable care to prevent harassment by showing its sexual harassment policies were "effectively published, that [they] contained reasonable complaint procedures, and that [they] contained no other fatal defect." *Id.* at 1314. The City disseminated and effectively published its Sexual and Gender Harassment Policy, and Plaintiff received the Policy during her new employee orientation in 2013 and participated in additional training on the Policy in January 2015. (Docs. # 22-1 at 86-87; 16-3; 16-6 at 29-30). She also signed three acknowledgement forms over the course of her employment with the City, each time certifying that (1) she understood how to report sexual harassment and (2) she had not suffered or was aware of any conduct at her work station that would constitute sexual harassment." (Docs. # 16-3; 16-4).[8] The City's Policy also contains reasonable complaint procedures because it "defines

---

[8] Specifically, Plaintiff signed the Sexual and Gender Harassment Policy Acknowledgment Form twice on December 12, 2013 and January 27, 2015. (Docs. # 16-3; 16-4). The form certifies that she received the Policy and understood the following:

> If I feel I am being harassed, I have a right and responsibility to communicate this directly to the alleged harasser, my supervisor, department head, a non-involved supervisor, the City's Personnel Office and/or seek resolution through the grievance and complaint procedures of the Rules and Regulations of the Jefferson County Personnel Board.

(*Id.*). Also on January 27, 2015, she checked "no" in response to both of the following two questions:

> Please state whether conduct has been directed toward you that would constitute sexual or gender harassment under the City of Birmingham's Sexual and Gender Harassment Policy within six months of the date of this certification.

> Please state whether you are aware of any conduct in your work station that would constitute sexual or gender harassment under the City of Birmingham's Sexual and Gender Harassment Policy within six months of the date of this certification.

(Doc. # 16-4).

sexual harassment, prohibits it, and also instructs employees to promptly report sexual harassment to [their supervisor, department head, or the Human Resources Department]." (Doc. # 16-8). *Williams*, 286 F. Supp. 3d at 1307. Plaintiff attempts to argue that the Policy's complaint procedures are unreasonable because it encourages employees to first approach the harasser and communicate that his or her conduct is offensive. (Doc. # 22 at 18). But, Plaintiff ignores the fact that the Policy lays out several alternative mechanisms for reporting potential harassment that do not involve dealing with the situation individually. (Doc. # 16-8 at 3-4). These alternative procedures include reporting the conduct to a department head or the Human Resources Department or utilizing the complaint procedures of the Rules and Regulations of the Jefferson County Personnel Board. (*Id*.). *See Walton v. Johnson & Johnson Servs.*, 347 F.3d 1272, 1287 (11th Cir. 2003) (finding that the employer's policy was not defective when it "provide[d] an alternative channel for making complaints other than the harassing supervisor").

As to the second element -- requiring employers to take reasonable care to correct sexually harassing behavior -- the court is mindful that Plaintiff did not present any complaint to the City about any alleged harassment. (Doc. # 22-1 at 89, 180-81). Thus, the City never received formal notice of the harassment and never launched an investigation into the harassment. (Doc. # 16-6 at 28). Nevertheless, Fancher -- operating only on rumors and co-worker concerns -- repeatedly questioned Plaintiff about the existence of a sexual relationship with Williams. (Doc. # 22-1 at 17-18, 98, 107-109, 152-54). Twice, Fancher directly asked Plaintiff whether she was having a relationship with Williams. (*Id*. at 18, 153-54). Each time, she replied no. (*Id*. at 18). Even though both Plaintiff and Williams denied the existence of the relationship, Fancher still instructed them (both together and separately) not to communicate with each other. (*Id*. at 17).

The Eleventh Circuit has held that "warnings and counseling of the harasser are enough

where the allegations [of sexual harassment] are substantiated." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1305 (11th Cir. 2007) (citing *Fleming v. Boeing Co.*, 120 F.3d 242, 246-47 (11th Cir. 1999)). "Because warning the harasser and counseling him ordinarily is enough [even] where the employer is able to substantiate the allegations, it certainly follows that the same remedy is enough where it is not able to do so." *Baldwin*, 480 F.3d at 1306. Here, Fancher asked both Plaintiff and Williams about their relationship and instructed them to stop communicating several times. Plaintiff cannot fault the City for not stopping a relationship which she repeatedly denied and covered up. (Doc. # 22 at 17-18). The City was not unreasonable in accepting Plaintiff's denials of the relationship and declining to pursue any additional monitoring remedies. Yet, the record reflects that Fancher continued to monitor Williams and Plaintiff to some degree because he had additional talks with them about the impropriety of any relationship that might be taking place. (Doc. # 22-1 at 17-18, 152-54). Accordingly, the City has satisfied its burden under the first element of the *Faragher-Ellerth* affirmative defense because it took reasonable care to prevent and correct the alleged harassment.

### 2. Plaintiff unreasonably failed to take advantage of the preventative and corrective opportunities the City provided.

To establish the second element of the affirmative defense, an employer must show that the employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765. Under the *Faragher* and *Ellerth* decisions, an employee's failure to use "the procedures in place to promptly report any harassment" satisfies the second element of the defense. *Baldwin*, 480 F.3d at 1306. Thus, "an employer must show not only that it fulfilled its responsibility, but also that the employee failed to fulfill hers." *Id.* at 1292.

Despite her knowledge of the City's various and alternative reporting mechanisms,

Plaintiff unreasonably failed to report any alleged sexual harassment. As discussed above, Plaintiff had multiple opportunities to review the City's Sexual and Gender Harassment Policy. (Docs. # 22-1 at 86-87; 16-3; 16-6 at 29-30). On December 12, 2013 and again on January 27, 2015, Plaintiff signed the City's Sexual and Gender Harassment Policy and Acknowledgment form, which states:

> If I feel I am being harassed, I have a right and responsibility to communicate this directly to the alleged harasser, my supervisor, department head, a non-involved supervisor, the City's Personnel Office and/or seek resolution through the grievance and complaint procedures of the Rules and Regulations of the Jefferson County Personnel Board.

(Docs. # 16-3; 16-4). Plaintiff also underwent mandatory training where she and Department Directors and Deputy Directors participated in exercises explaining how to report instances of sexual harassment. (Docs. # 16-6 at 29-30; 22-1 at 93-96). Regardless of this knowledge and training, Plaintiff concedes that she never used any of the City's available procedures to report the alleged harassment. (Doc. # 22-1 at 180-81).

Plaintiff's attempts to justify her failure to report the alleged harassment because she felt indirectly threatened by Williams's influence over her career fall flat. (Doc. # 22 at 18). "[S]ubjective fears of reprisal, standing alone, do not excuse an employee's failure to report a supervisor's harassment in accordance with the employer's policy." *Arnold v. Tuskegee Univ.*, 212 Fed. Appx. 803, 810 (11th Cir. 2006). Plaintiff's fear of retaliation essentially derives from her witnessing Williams exercise his authority as a Deputy Director. Without more, this assertion is insufficient to overcome her failure to report the harassment. Therefore, the court concludes that the City has satisfied the second element of its affirmative defense.

Even if Plaintiff was subjected to an actionable hostile environment (which, to be clear, the Rule 56 evidence clearly shows she was not), the City has successfully shown that, based upon the

undisputed evidence, it is entitled to prevail on its *Faragher-Ellerth* affirmative defense. Therefore, the City is entitled to summary judgment on Plaintiff's Title VII sexual harassment claim for this additional reason.

### B. The City is Due Summary Judgment on Plaintiff's Title VII Retaliation Claim

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). (Doc. # 30 at ¶ 43).

Plaintiff avers that she was constructively terminated in retaliation for advising a co-worker to take her nepotism complaint to the EEOC. (Doc. # 22-1 at 22-28). Specifically, her co-worker's complaint involved "not being hired with the City and that the other supervisor had got her daughters on. And she knew that the daughters were not being hired, and Ms. Fatuma felt that that caused a problem as far as her being discriminated against."[9] (Doc. # 22-1 at 23). The City argues that it should be granted summary judgment because (1) reporting nepotism is not a protected activity under Title VII and (2) in any event, Plaintiff did not suffer an adverse employment action because she resigned her employment. (Doc. # 16 at 28-30). Because Plaintiff has failed to establish that she engaged in any statutorily protected activity under Title VII or suffered an adverse employment action, the City is entitled to summary judgment on Plaintiff's retaliation claim.

---

[9] Again, although the court is unsure as to what Robinson specifically complained of, the court understands that her complaint involved nepotism. Regardless, the factual details of her complaint are immaterial to this court's analysis. As explained more thoroughly below, nepotism is not an unlawful employment practice under Title VII. Even if it was, the Rule 56 record does not demonstrate that Plaintiff engaged in any statutorily protected activity or suffered any adverse employment action as a result of any such activity.

### i.   Statutorily Protected Activity

The retaliation provision of Title VII is divided into two clauses. The opposition clause provides that "an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'" *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citing 42 U.S.C. § 2000e–3(a)). The participation clause prevents an employer from retaliating "against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Id*.

Although the parties have not couched their arguments in these specific terms, the court gathers from their briefing that (1) the City argues that the opposition clause has no application here because reporting nepotism is not a practice made unlawful under Title VII (Doc. # 16 at 28-30); and (2) Plaintiff claims that she engaged in protected activity under the participation clause because she assisted a co-worker in lodging a complaint with the EEOC (Doc. # 22 at 20-21). After careful review, the court concludes that Plaintiff's advice to her co-worker to file her nepotism complaint with the EEOC does not constitute protected activity under either clause.

### a.   The Opposition Clause

As an initial matter, the court notes that the City has overlooked a foundational issue with respect to Plaintiff's retaliation claim—namely, Plaintiff has not shown that she "opposed" *any* practice of the City. The term "oppose" is given its normal meaning: "[t]o resist or antagonize ...; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1957)). "'When an employee communicates to her employer a belief that the employer has engaged in…a form of employment discrimination, that communication' virtually

always 'constitutes the employee's *opposition* to the activity.'" *Id.* (quoting 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003)). At the very least, an employee must "communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. Appx. 847, 852 (11th Cir. 2009) (internal quotations omitted).

Here, the Rule 56 record shows that Plaintiff told Robinson, "[W]ell, do what you have to do. You may have to go to the EEOC." (Doc. # 22-1 at 24). Even assuming that nepotism qualifies as an unlawful practice under the statute (and, to be clear, as explained below it does not), this statement to her co-worker does not amount to Title VII "opposition" because (1) Plaintiff did not express her own disagreement with the City's actions and (2) even if she did disagree, she did not communicate that disagreement to her employer. Also (and more to the point of the facts that make up the substantial portion of the Rule 56 record), Plaintiff never "opposed" any alleged sexual harassment for the purposes of her retaliation claim. Indeed, Plaintiff testified that she never complained to the City about any policies or practices, including sexual harassment: "No, I never talked to any employees about sexual harassment or anything…No employees came to be about sexual harassment. I never wrote anything up. I never talked to any." (Doc. # 22-1 at 38). On this record, Plaintiff has not shown that she opposed *any* employment practice under Title VII's opposition clause.

Moreover, even if she could show she "opposed" nepotism, as the City correctly argues, Plaintiff's retaliation claim also fails because she has not shown that she opposed "a practice made unlawful by Title VII." *Bush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 786 (11th Cir. 2012). To be clear, to satisfy the opposition clause, Plaintiff "need not prove that the practice opposed actually violated Title VII in order to recover for retaliation." *Watkins v. Fairfield Nursing &*

*Rehab. Ctr., LLC*, 2012 WL 1566228, at *4 (N.D. Ala. Apr. 26, 2012) (citing *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001)). However, she must demonstrate "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* at *5 (citing *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997)). Quite obviously, in determining the reasonableness of Plaintiff's belief, "the court must consider preexisting case law." *Id.*[10]

Title VII provides that "[i]t shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin…." 42 U.S.C. § 2000e-2(a)(1). Noticeably absent from this list is the lawful practice of nepotism. Even if she believed the City was engaged in nepotism, Plaintiff could not have held a reasonable belief that such a practice violated Title VII because nepotism is not grounded in race, color, religion, sex, or national origin. In fact, favoritism of this sort, while perhaps unfair, is gender and color neutral and not indicative of any discrimination. *See Watkins*, 2012 WL 1566228, at *5-8 (noting the long line of Eleventh Circuit precedent holding that favoritism of even a paramour is gender neutral and more similar to nepotism, rather than sexism). Thus, even if she had opposed the City's alleged practice of nepotism, Plaintiff cannot demonstrate a reasonable belief that nepotism was an unlawful employment practice.

### b. The Participation Clause

The participation clause covers participation in "proceedings and activities which occur in

---

[10] Again, the parties have not briefed this issue in accordance with the above-referenced caselaw. Nevertheless, out of an abundance of caution, the court analyzes whether Plaintiff held a reasonable belief that the City was engaged in an unlawful employment practice.

conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *Total System Services*, 221 F.3d at 1174. Here, Plaintiff's participation in Robinson's nepotism complaint ended with her advising Robinson to first talk with Fancher, then contact the EEOC. (Doc. # 22-1 at 22-24). There is no evidence in the Rule 56 record that Plaintiff either helped Robinson file an EEOC charge or further assisted in any resulting EEOC investigation relating to her nepotism complaint. According to Plaintiff's own testimony, "Nobody called me from EEOC that Ms. Robinson made." (*Id.* at 22). Plaintiff's conduct therefore is categorically not protected by the participation clause.

Because the court concludes that Plaintiff did not engage in any statutorily protected activity under Title VII's retaliation provision, she has failed to establish a *prima facie* case of retaliation.

### ii.    Adverse Employment Action

The City is also entitled to summary judgment on Plaintiff's retaliation claim because she has not established that she suffered an adverse employment action, much less an adverse employment action which was causally related to any protected conduct. In her Amended Complaint, Plaintiff alleges that she was "constructively terminated and not rehired into her previous position or any position in retaliation for engaging in a protected activity under Title VII." (Doc. # 30 at ¶ 43). However, the parties have failed to recognize in their briefing the standard for establishing the second element of a Title VII retaliation claim. In *Kurtts v. Chiropractic Strategies Group., Inc.*, the Eleventh Circuit noted that the meaning of a Title VII adverse action is much broader in the retaliation context than in the discrimination context:

> We begin by noting that the parties have assumed that the definition of an adverse employment action under the anti-retaliation provision of Title VII, 42 U.S.C. §

2000e–3(a), is the same as that for an adverse employment action under the anti-discrimination, or substantive, provision of the statute, § 2000e–2(a). The Supreme Court rejected this view in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64, 126 S.Ct. 2405, 2412-13, 165 L.Ed.2d 345 (2006), and we have recognized that our prior precedent was abrogated by this decision. *See Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008).

The Supreme Court clarified that "Title VII's substantive provision and its antiretaliation provision are not coterminous." *Burlington*, 548 U.S. at 67, 126 S.Ct. at 2414. To establish a prima facie case of retaliation, a plaintiff is not required to show "an ultimate employment decision or substantial employment action." *Crawford*, 529 F.3d at 974. It is therefore unnecessary to decide whether a reasonable jury could find that Kurtts was constructively discharged.

The key question is whether the employer's conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington*, 548 U.S. at 68, 126 S.Ct. at 2415).

*Daugherty v. Warehouse Home Furnishings Distributors, Inc.*, 951 F. Supp. 2d 1275, 1278 (N.D. Ala. 2013) (quoting *Kurtts*, 481 Fed. Appx. 462, 467 (11th Cir. 2012)).

Nevertheless, even under this more flexible standard, Plaintiff has failed to carry her burden. Again, on March 16, 2016, Fancher called Plaintiff into his office to discuss reports he had received that she was advising other employees to take their sexual harassment complaints directly to the EEOC. (Doc. # 22-1 at 25-27, 155-57; Doc. # 16-7). During this conversation, Fancher read the City's Gender and Sexual Harassment Policy to Plaintiff and emphasized the importance of using the City's internal reporting mechanisms to investigate potential harassment. (*Id.*). He told Plaintiff that as a supervisor, it was her job to make certain these policies were upheld. (*Id.*). Moreover, Plaintiff "did not take it [that her] job was in jeopardy" when she left the meeting, and the City took no action to either discipline or terminate her. (*Id.* at 31, 38). No reasonable jury could find that Fancher's reaction would dissuade a reasonable worker from making or supporting a charge of discrimination, particularly since the City took no action to either discipline or terminate Plaintiff. If anything, Fancher reinforced the importance of reporting incidents of sexual

harassment and the City's willingness to handle such complaints internally, promptly, and effectively.

Accordingly, the City is entitled to summary judgment on Plaintiff's Title VII retaliation claim because she has failed to demonstrate that she engaged in any protected activity or suffered an adverse employment action.[11]

## C. Plaintiff's State Law Claims

Plaintiff also asserts two state law claims against Defendants: invasion of privacy (Doc. # 30 at ¶¶ 33-36) and negligent hiring/training/supervision/retention (*Id.* at ¶¶ 37-41). However, because Defendants are entitled to summary judgment on all of Plaintiff's federal claims raised under Title VII, the court has the discretion to either exercise supplemental jurisdiction over

---

[11] Although not necessary to its holding, the court briefly addresses Defendants' final argument that all of Plaintiff's claims are due to be dismissed pursuant to the doctrine of judicial estoppel. (Docs. # 16 at 35-38; 17 at 23-26). Specifically, Defendants argue that Plaintiff violated her continuing duty to disclose her potential lawsuit to the bankruptcy court during her bankruptcy proceedings. (*Id.*). *See* 11 U.S.C. §§ 521(1), 541(a)(7). Judicial estoppel precludes "a party from assuming a position in a legal proceeding inconsistent with one previously asserted." *See Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir. 2012). "[A] district court may apply judicial estoppel when a two-part test is satisfied: the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system." *Slater v. United States Steel Corporation*, 871 F.3d 1174, 1180 (11th Cir. 2017). However, judicial estoppel should not be applied "when the inconsistent positions were the result of 'inadvertence[ ] or mistake' because judicial estoppel 'looks towards cold manipulation and not an unthinking or confused blunder.'" *Id.* at 1181 (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)).

Here, Plaintiff filed her voluntary petition for Chapter 13 bankruptcy on March 11, 2015, but she did not disclose her potential employment claims (even though some of the underlying events occurred in 2014). (Doc. # 16-10 at 2-45). Plaintiff amended her petition on April 10, 2015, but again, she did not include her potential civil claims. (*Id.* at 46-52). Plaintiff's bankruptcy case was still pending when she submitted her EEOC charge on July 5, 2016. (Doc. # 22-8). The charge alleged that she was subjected to a hostile work environment from 2014 until she was constructively terminated on March 18, 2016. (Doc. # 22-8). After Plaintiff defaulted, the bankruptcy court dismissed Plaintiff's bankruptcy case on June 15, 2017. (Doc. # 16-10 at 53-54). Plaintiff then filed the instant civil suit on July 11, 2017. (Doc. # 1).

The timeline of Plaintiff's bankruptcy and civil cases presents an interesting question. To be sure, Plaintiff has provided no justification for why she twice failed to notify the bankruptcy court of her potential civil suit. However, because Plaintiff's bankruptcy case resulted in a dismissal prior to the initiation of this action, the court concludes that she received no benefit from her failure to disclose. *See Spann v. DynCorp Tech. Servs., LLC*, 403 F. Supp. 2d 1082, 1087 (M.D. Ala. 2005). Indeed, Plaintiff's creditors may still pursue their claims against her. With no benefit to be gained in the form of a discharge of her debts, Plaintiff had no motive to conceal her potential lawsuit, and thus no intent to make a mockery of the judicial system. *Id.* Because it cannot be said that Plaintiff intentionally manipulated the courts to gain an advantage through her inconsistent positions, the court declines to apply judicial estoppel as an additional reason to dismiss her claims.

Plaintiff's state law claims or dismiss them. Under 28 U.S.C. § 1367(c)(3), "[a] district court may decline to exercise supplemental jurisdiction over a [state law] claim…if…the district court has dismissed all claims over which it has original jurisdiction." In that event, a plaintiff may have the option to refile those claims in state court, as appropriate. Although the court recognizes that there may be meritorious arguments weighing in favor of dismissal of Plaintiff's state law claims, the court nevertheless finds it appropriate to decline jurisdiction to respect principles of federalism. To be sure, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when…the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1089 (11th Cir.2004). In light of this precedent, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Accordingly, these claims are due to be dismissed without prejudice.

## IV.    Conclusion

For the reasons explained above, Defendants' Motions for Summary Judgment (Docs. # 16, 17) are due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this June 25, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE